Filed 1/9/15  In re C.F. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

|  |  |
|---|---|
| In re C.F., a Person Coming Under the Juvenile Court Law. | C074429 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.F. et al.,<br><br>Defendants and Respondents;<br><br>G.E.,<br><br>Objector and Appellant. | (Super. Ct. No. 13JVSQ2811702) |

Appellant G.E., paternal grandmother of minor C.F., appeals from the juvenile court's jurisdiction and dispositional orders, which included the removal of the minor from her home and the termination of her probate guardianship of the minor.  (Welf. &

1

Inst. Code, §§ 361, 395, 728.)[1] She contends there was insufficient evidence to support removal and termination of guardianship. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This is the second dependency case involving minor C.F., after appellant had repeatedly left him alone with unfit caregivers, twice resulting in intervention by emergency responders.

*First Dependency Case and Resulting Guardianship*

At the time of the minor's birth in April 2008, his maternal half sibling was a dependent child of the court and removed from mother's custody. Mother participated in drug rehabilitation services, regained custody of the half sibling, and moved into appellant's home with the minor's father.

In November 2008, however, mother was arrested on drug-related charges. Father also has a history of drug abuse, as well as a gambling addiction. The half sibling was detained again and Shasta County Health and Human Services Agency (the Agency) sought to detain the minor as well. Appellant took temporary custody of the minor and agreed to a safety plan to protect him from his parents. The terms of the safety plan included that appellant would have a particular named relative, *not the parents*, provide childcare while she was at work. Appellant was also to, and did, obtain probate guardianship of the minor.

On August 4, 2009, emergency personnel rescued the 15-month-old minor who had been left in a car seat alone in the back of a pickup truck with the (front) windows open for over 45 minutes. The truck was parked at a casino, in the sun, on a 92 degree day with no breeze. The minor was screaming and crying, and had no water. He was treated for heat related injuries. Father had left minor in the car. He had been taking care

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

of the minor for the previous *four months* from Sunday nights to Friday nights, and had gone to the casino because he "wanted to gamble five dollars and have a drink." He was arrested and charged with child abuse.

Appellant admitted that she only cared for the minor two to three days a week, rather than full time except when assisted by a relative other than the parents, as the safety plan had required. She further admitted she knew mother was visiting "freely" at father's residence, rather than as arranged by appellant, as the safety plan also required. The minor was detained, and the Agency filed a section 300 petition on his behalf, alleging appellant was "unable or unwilling to protect" the minor.

Appellant was provided interim case plan services and began working with providers to address her codependency and lack of judgment related to allowing father to take care of the minor. By November 2009, appellant had acknowledged that it was poor judgment to allow father to take care of the minor. The social worker reported that appellant had seemed to have "grown" from the situation and appeared to be demonstrating some boundaries with father. Appellant was, however, contending that the parents' visitation with the minor was too infrequent and hoped her guardianship would be temporary and the parents could regain custody of the minor.

On November 12, 2009, one week before father was to be sentenced on his child abuse conviction, he left the 18-month-old minor unattended at the family center following a court authorized visit, instead of waiting for the foster parent to arrive before leaving or notifying staff. Appellant attempted to justify father's actions, explaining that another visiting parent remained to supervise the minor until the foster parent arrived.

On November 19, 2009, father was sentenced to four years in state prison as a consequence of having left the minor unattended in the casino parking lot. Father's criminal history included numerous arrests and several convictions for possession of controlled substances, receiving stolen property, possession/manufacture sale of dangerous weapons, petty theft, insufficient funds, possession of a hypodermic needle,

3

driving under the influence, and other vehicle code violations. He admitted to the social worker that he had used methamphetamine as recently as September 6, 2009.

Despite knowing of father's criminal history, his substance abuse problem, and his failure to participate in any substance abuse services, appellant continued to assert that she was unaware father was using drugs, or that there were any concerns regarding his ongoing supervision of the minor.

In March 2010, appellant underwent a psychological and bonding assessment with Dr. Reid McKellar. McKellar reported that appellant and the minor had a strong attachment and bond. However, he noted several areas of concern: (1) appellant failed to recognize any behavioral patterns that contributed to her own two children's dysfunctions; (2) she did not demonstrate insight into her own parenting; (3) she may have an indulgent parenting style with a tendency to overlook her children's mistakes and deficits, and to make excuses for them; (4) she was unable to recall any of the behavioral or disciplinary lessons from her parenting class; (5) she did not verbalize any of the benefits from the Al-Anon meetings she had attended; and (6) she exhibited limited insight into past and present circumstances. McKellar recommended therapy to address appellant's codependency and to help her gain insight into her psychological and emotional blind spots prior to reunification with the minor.

A month after the evaluation, the parties participated in a settlement conference, after which the Agency withdrew its motion to terminate guardianship. The juvenile court then ordered the minor returned to appellant's care under a plan of family maintenance.

On August 9, 2010, the juvenile court terminated dependency. Appellant had completed parenting services and completed her therapy sessions with a positive report from the therapist. Father remained incarcerated but, in anticipation of his future release, the juvenile court specifically ordered a safety plan that prohibited father from having unsupervised visitation, prohibited father from living in a home owned or rented by

4

appellant, prohibited appellant from allowing father or mother to provide childcare for the minor, and prohibited visits from occurring in mother's home. Appellant agreed to the safety plan.

*Second Dependency Case and Resulting Termination of Guardianship*

In May 2012, father was released from prison. The superior court's JALAN system reflected father listed appellant's address as his own.

At 7:30 p.m. on March 19, 2013, a police officer rescued the four-year-old minor, who had been left alone in a car in a Walmart parking lot. Appellant's grown daughter, Tanya, (the minor's aunt) had left the minor in the car while she was shopping. A concerned citizen had seen the minor alone and, after no one came to the car, called the police. The police officer waited in the parking lot for 40 minutes, and had Tanya paged multiple times. When no one came for the minor, he took the minor into protective custody. Had he not done so, the minor would have been left unattended in the unlocked car for over two hours.

Tanya had picked the minor up from daycare around 4:00 p.m. and had asked appellant if she could take the minor to Walmart.[2] The minor knew his mother's telephone number; when contacted, mother provided the social worker with appellant's number. The line remained busy. At 9:41 p.m., appellant called the police station and explained she had found out the minor had been taken by the police. Father arrived shortly thereafter, hoping to pick up the minor.

Tanya did not accompany father to the police station because, according to father, she feared she would be arrested. She later told the police officer that she did not think it

---

[2] Appellant had first asked father to pick up the minor from daycare, but he was unavailable. We note that the safety plan in place at that time required appellant to prohibit father from even *visiting* the minor without supervision, as well as prohibited him from providing childcare.

5

was wrong to leave the minor unattended in the car. The officer told Tanya the minor had left the vehicle and been wandering the parking lot; Tanya responded that he knew to stay in the car and he should not have gotten out. Tanya was, however, aware that the minor had been the subject of a dependency action in 2009 after father had left him alone in the truck.[3]

Appellant told the social worker that the minor never stayed with anyone other than her, father, or mother. With respect to father's living arrangements, he stayed with her or with friends. (She later testified that father did not live with her, although he did occasionally spend the night.) Mother lived with the maternal grandmother and visited the minor in that home. Father denied that he lived with appellant, but had visited overnight with the minor in her home. The minor reported that father lived with him.

On March 21, 2013, the Agency filed a section 300 petition on behalf of the minor. The petition alleged appellant had been unable or unwilling to protect the minor from abuse or neglect in the home, and that both parents have unresolved substance abuse problems that placed the minor at risk of harm or neglect. The petition also alleged that appellant was aware that Tanya suffered from a mental health disability and, nonetheless, left the minor in Tanya's care. Appellant and father were reportedly residing at the same address at the time the petition was filed.

When the social worker interviewed Tanya, who claimed she had lost track of time while shopping in Walmart, the social worker noticed that Tanya's thought patterns were very disjointed. She asked Tanya why she was on disability and Tanya explained that she had been diagnosed with a personality disorder, but now believed she was suffering from

---

[3] The minor told the social worker that appellant had retrieved him from a stranger in the past.

depression.[4] Tanya stated that appellant had recently referred her to Adult Protective Services.

Appellant said that Tanya had taken the minor to the store several times before and there had never been a problem. Appellant said she had seen no "red flags" to indicate that Tanya had not taken good care of the minor in the past.

Appellant, however, knew Tanya was on disability for many years but claimed she was not sure why. She noted that Tanya had intense pain due to a car accident. Appellant knew that Tanya had children while in her twenties, but they had been removed by Child Protective Services. Appellant also knew Tanya had a history of substance abuse, had a lengthy criminal history involving arrests and convictions for thefts, assaults, and drug-related offenses, and that Tanya had spent time in state prison. Appellant also admitted she knew that Tanya was having difficulty managing her medications and that Tanya was trying to get the pain medications--including Cymbalta, morphine, and methadone--"out of her system."

On January 31, 2013, Tanya had called 911 for a priest and requested assistance for "snakes in her uterus." The next day (February 1, 2013) appellant called the police to request a welfare check on Tanya because she was not answering her phone or door for three days but appeared to be home. Later in February, Shasta County Adult Protective Services had received a report that Tanya was isolating, not taking medication as directed, and was on a "downward spiral." Father had told the probation officer who prepared the sentencing report for his criminal case that Tanya suffers from severe mental health issues and has psychotic episodes where she hears and sees things that are not actually present. Mother said that appellant should not have allowed Tanya to care for

---

[4] Tanya subsequently testified that she was diagnosed with a personality disorder around 1993 and told appellant of that diagnosis. She was on disability for both the personality disorder that led to her depression and the effects of the car accident.

7

the minor. When queried as to why, mother became evasive and simply stated that there must be a reason Tanya was receiving disability.

The contested jurisdiction and disposition hearing was held on June 7, 2013. Appellant's counsel requested a continuance of the disposition hearing in order to have Dr. McKellar perform *another* bonding assessment. He emphasized that the minor truly missed appellant. The court noted in response that the issue was the safety of the minor in appellant's care. Appellant's counsel suggested it was important to have expert testimony and the court responded, "[B]ut the relevancy of the bonding study in light of the issues that are presented to the Court, can you articulate for me how they would be relevant?" Appellant's counsel explained that minor's strong bond to appellant was relevant because of possible harm to the minor if he were removed from her.

After hearing testimony from appellant and Tanya relating to jurisdiction, the court revisited the subject of the bonding study, informing appellant's counsel that it tentatively was not convinced such a study would be relevant. Counsel reiterated that he felt the study was needed to determine the extent of the psychological damage removal from appellant could have on the minor, which should be considered along with the minor's physical safety. The juvenile court declined to order the additional bonding study, explaining: "The Court recognizes that the [appellant] will remain a paternal grandmother to the child and will remain in a relationship with the child through this reunification process and can meet -- visit with the child as we allow grandparents to visit with the child, so the nature of that relationship will be maintained through these proceedings. But the safety of the child is paramount to the Court. And the Court feels that a bonding study would not assist the Court in making the decisions the court needs to make with respect to [the minor's] safety . . . ."

The juvenile court sustained the allegations in the petition and terminated appellant's guardianship, removing the minor from her home. The minor was declared a

8

dependent child of the court and the court ordered reunification services be provided to both parents.

## DISCUSSION

### I

### *Evidence Supporting Removal*

Appellant contends there was insufficient evidence to support the order removing the minor from her custody. We disagree.

A. *Standard of Review*

A dependent child may not be taken from the physical custody of his parent or guardian with whom he resides unless the court finds clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1); see *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) The court also must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor." (§ 361, subd. (d).) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, overruled on other grounds in *In re Renee J.* (2001) 26 Cal.4th 735, 748, fn. 6.)

Removal findings are reviewed for substantial evidence, drawing all reasonable inferences to support the findings and noting that issues of credibility are matters for the trial court. (*In re Heather A.*, *supra*, 52 Cal.App.4th at p. 193.) Further, evidence of past conduct may be probative of current conditions, particularly where there is reason to believe the conduct will continue in the future. (See *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.)

B. *Substantial Evidence of Risk to Minor*

As we detailed *ante*, appellant had repeatedly left the minor in the care of her adult children, who are unsuitable caregivers. She was aware of father's criminal history, his substance abuse problem, and his failure to participate in any substance abuse services. She originally obtained guardianship and agreed to the safety plan due to father's failings. Despite this, she asserted repeatedly that she was unaware there were any concerns regarding father's (unsupervised) care of the minor, and she liberally permitted this contact. After most recent his release from incarceration, she permitted father to live with her and the minor and continued to permit him to care for the minor, despite a new safety plan directly to the contrary. Further, she permitted mother to visit the minor in mother's home, also in direct violation of the safety plan.

Appellant allowed Tanya to care for the minor, and did not understand the related concerns, despite the fact that Tanya's mental disability was readily apparent to father and mother, and even noticed by the social worker during an interview. Appellant knew of Tanya's troubled history and that she was having difficulty with medication compliance. She had recently called Adult Protective Services regarding Tanya, yet she treated Tanya as an appropriate caregiver for the minor.

The record in its totality shows that appellant has repeatedly put the minor at direct risk of harm as a result of her chronic poor judgment as to the suitability of family members as unsupervised caretakers for the minor. Given the dangerous consequences, which we have detailed *ante*, as well as the potentially even *more* dangerous consequences of this lack of judgment, there was sufficient evidence of substantial danger to the minor's physical and emotional health, safety, and well-being to support removal of the minor from appellant's home.

C. *Alternatives to Removal*

Appellant argues the juvenile court failed to consider alternatives to removal. But the record reflects that the Agency and court had made reasonable efforts to eliminate the

10

need for removal of the minor from appellant's custody by giving her the opportunity to engage in services and enter into protective safety plans. Those efforts had not succeeded, and the risk to the minor continued.

Appellant had completed a parenting program, attended Al-Anon meetings, and received individual therapy to address her codependency and lack of insight into past and current circumstances. Nonetheless, as we have described, she consistently failed (or refused) to recognize her own children's inability to ensure the minor's safety.

Continued placement in appellant's home, even with close supervision and conditions, was not a viable alternative to removal, due to her apparent inability to recognize her persistent disregard of the rules. There was no reason to believe appellant would comply with further restrictions or conditions when she had not complied with the safety plan already ordered. Nor is it reasonable for a social worker to monitor appellant and the minor around the clock to insure compliance with the terms and conditions of custody or exercising good judgment in the minor's care. Appellant needed to develop and exercise those capabilities on her own, with the assistance she was getting; she demonstrated that she could not do so.

On this record, the juvenile court had no alternative but to insure the minor's protection by ordering him removed from appellant's custody.

D. *Consideration of Detriment*

Appellant argues that in removing the minor from her, the juvenile court failed to adequately consider the minor's bond to her and the detrimental impact removal would have on him. She argues that the court erred in failing to balance the detrimental impact of removal against the potential risk of harm to which the minor was being exposed. We find no error.

Preliminarily, we disagree with appellant's assertion that the juvenile court failed to even *consider* the potential detriment removal would have on the minor prior to entering the removal order. Evidence of potential detriment was presented to the court

11

and, on review, we presume the court considered all factors relevant to its decision, absent affirmative evidence that it did not.  (Evid. Code, § 664; cf. *In re Steven A.* (1993) 15 Cal.App.4th 754, 765.)

The record was clear that the minor was strongly bonded to appellant.  The court's decision that a second bonding study was unnecessary to its determination whether to remove the minor does not signal that the court did not *consider* this bond in entering its order.  Further, the juvenile court revealed its consideration of the minor's bond to appellant (and the potential detriment to the minor of disrupting that bond) when it explained that the minor would still maintain a relationship with appellant.

In support of her argument that balancing was required, appellant relies on *In re Jamie M.* (1982) 134 Cal.App.3d 530 (parent's schizophrenia does not support removal, in absence of evidence of actual detriment to minor resulting therefrom); *In re Jeanette S.* (1979) 94 Cal.App.3d 52 (minor in good health and in no immediate danger from filthy conditions of home, which could be cleaned and monitored, and trial court had failed to pursue reunification options before ordering removal); *In re Paul E.* (1995) 39 Cal.App.4th 996 (potential hazards listed were trivial and chronic messiness did not support finding of substantial risk of harm); and *Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067 (fact of parent's mental illness, which was being managed, coupled with a single instance of parental tardiness in retrieving child from supervised setting, does not pose substantial risk of harm to the child to warrant removal).

Appellant's reliance on these cases is misplaced.  In each of the cases cited by appellant, the minors were exposed to potential risks that the appellate courts concluded were not sufficient to warrant removal of the minor.  Here, as we have explained, the risk to the minor had already resulted to the minor's being rescued from dangerous situations. The risk was actual, no longer merely potential as in the cases on which appellant relies. Here, to the extent that a balancing test is even arguably required, the risk of harm outweighed the evidence of detriment.

12

## II

### *Termination of Guardianship*

Appellant contends that substantial evidence does not support the juvenile court's order terminating her guardianship.  Again, we disagree.

A.  *Standard of Review*

Where a minor is the subject of a section 300 petition, the juvenile court may terminate the minor's probate guardianship on noticed motion at any stage of the dependency proceedings.  (§ 728, subd. (a); *In re Merrick V.* (2004) 122 Cal.App.4th 235, 253.)  A guardian is not entitled to reunification services prior to termination of the guardianship.  (*In re Merrick V.*, at p. 253.)  The showing required to terminate the guardianship is that it would be in the minor's best interests to do so.  (*In re Angel S.* (2007) 156 Cal.App.4th 1202, 1208.)

We review a juvenile court's order terminating a probate guardianship under the substantial evidence standard.  (*In re Merrick V.*, *supra*, 122 Cal.App.4th at p. 254.)  This means, among other things, that we resolve all evidentiary disputes in favor of the court's rulings and draw all reasonable inferences to support them.  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

B.  *The Minor's Best Interests*

The minor has already been subjected to significant instability in his young life.  He was removed from his parents and placed with appellant under a guardianship at six months of age.  He was then removed from appellant when he was 15 months old, after having been left alone in the truck at the casino, and remained in foster care for seven months before returning to appellant.  His father, who had been providing the majority of his care, was incarcerated for two and a half years, and then moved back into his home.

Only three years after returning to appellant's care, the minor was removed a second time, for substantially the same reasons.  The removal was, again, a result of appellant's chronic poor judgment and lack of insight in selecting caregivers, which

13

repeatedly placed the minor in harm's way and continued despite safety plans and court orders to the contrary.

When, as here, a minor has been repeatedly removed, "at least part of the best interest analysis must be a finding that further reunification services have a likelihood of success." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1228.) As we have already discussed, there was simply no evidence to support a finding that another reunification with appellant would provide the minor with permanency and stability throughout the remainder of his childhood. (See *id*. at p. 1229.) Despite the minor's strong bond to appellant, his best interests were not served by merely postponing his chance for stability and continuity by subjecting him to yet another placement with appellant which was destined to fail. (*Ibid.*)

**DISPOSITION**

The judgment is affirmed.


                                                          DUARTE              , J.



We concur:



      BLEASE            , Acting P. J.



      ROBIE             , J.



14